FILED IN CLERK'S OFFICE
U.S.D.C - Atlanta

JUL - 2 2012

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| I. L. FLEMING, on behalf of the United States of America, | ) ) ) | **FILED UNDER SEAL** |
| Plaintiff/Relator, | ) ) | **CIVIL ACTION FILE** |
| v. | ) ) | **NO.** |
| PBS&J CONSTRUCTORS, INC., PETER R. BROWN CONSTRUCTION, INC., and ATKINS NORTH AMERICA, INC., | ) ) ) ) ) | **1:12-CV-2302** |
| Defendants. | ) ) | **Jury Trial Requested** |

## COMPLAINT

Plaintiff I. L. Fleming files this Complaint as follows:

### NATURE OF THE CASE

1.     This is a *qui tam* action brought under the False Claims Act ("FCA"),

31 U.S.C. §§ 3729, *et seq.* I.L. Fleming ("Fleming") brings this action as relator on

behalf of Plaintiff United States of America.  Defendants PBS&J Constructors, Inc.

("PBS&J"), Peter R. Brown Construction, Inc. ("Brown"), and Atkins North

America, Inc. ("Atkins NA") (collectively the "Atkins Companies") are affiliated

entities owned ultimately by Atkins, a global engineering and construction company headquartered in the United Kingdom.

2.     This complaint concerns a scheme by the Atkins Companies to obtain illegal control of ten contracts ("Contracts") between I. L. Fleming, Inc. ("ILF") and the United States, acting through the United States Army Corps of Engineers ("COE").

3.     The Contracts were worth more than $100 million and were set aside for socially and economically disadvantaged small business concerns under section 8(a) of the Small Business Act, 15 U.S.C. § 637(a).

4.     The Atkins Companies entered into oral and written teaming agreements with ILF, a socially and economically disadvantaged small business concern approved as an 8(a) contractor by the Small Business Administration ("SBA") and owned by Plaintiff Fleming.  Under the teaming agreements, the Atkins Companies agreed to assist ILF with the Contracts by, for example, providing bonds. In return, ILF agreed to subcontract a portion of the Contracts to the Atkins Companies.

5.     With the assistance of the Atkins Companies, ILF obtained award of the Contracts by the COE. IFL then issued subcontracts to the Atkins Companies. After award, the Atkins Companies schemed to control the entire work and the

flow of all funds for the Contracts. The Atkins Companies also schemed to have ILF default terminated on several of the Contracts and, when the COE called on their surety to complete the work, the Atkins Companies took over the work as their surety's designated completion contractor.

6.      Over the constant protests of ILF, the Atkins Companies also asserted control over the contract funds and, in violation of the law, exercised control over the performance of the work. The Atkins Companies also schemed to control the profits from the Contracts. As a result of their schemes, the Atkins Companies— very large business concerns—took over performance of more than $100 million of contracts set aside for a socially and economically disadvantaged small business concerns.

7.      The Atkins Companies submitted monthly invoices to IFL in connection with the Contracts, knowing that the invoices were being sent to the United States Government for work that had been set aside for an 8(a) small business concern, knowing that compliance with the 8(a) program was a condition of performance for the Contracts, and knowing that its control over the Contracts violated the requirements for contracts awarded under the 8(a) program. The Atkins Companies submitted more than a thousand invoices in connection with the Contracts and each invoice was a false claim.

8.     This action is not based on prior public disclosures of allegations or transactions in any criminal or civil lawsuit, in any administrative hearing, in any governmental investigation, audit, or report, or in any report by any news media.

9.     Plaintiff has direct and independent knowledge of the information set forth in this complaint, and is the original source of the information on which this qui tam action is based.

10.     This Complaint is supported by material evidence, and Fleming is entitled to bring this action.

## JURISDICTION AND VENUE

11.     Fleming is an individual and a citizen of the State of Georgia.

12.     Defendant PBS&J is a citizen of the State of Florida being incorporated in the State of Florida and with its principal place of business in Tampa, Florida.

13.     Defendant Brown is a citizen of the State of Florida being incorporated in the State of Florida and with its principal place of business in Clearwater, Florida.  Brown does business as Post Buckley and has assumed all PBS&J's contract obligations.  Brown may be served by its registered agent in Georgia, Corporate Creations Network, Inc., 2985 Gordy Parkway, First Floor, Marietta, Georgia 30066.

14.    Atkins NA is a citizen of the State of Florida being incorporated in the State of Florida and with their principal place of business in Tampa, Florida. Atkins NA is the United States parent of Brown and PBS&J and has assumed all contracts, obligations and agreements entered by its subsidiaries.  Atkins NA may be served through its registered agent in Georgia, Corporate Creations Network, Inc., whose address is 2985 Gordy Parkway, First Floor, Marietta, Georgia 30066.

15.    Complete diversity exists between ILF and the Atkins Companies and independent subject matter jurisdiction exists for this complaint pursuant to 28 U.S.C. § 1332.   The amount in controversy exceeds $75,000, exclusive of interest and costs.  The Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 31 U.S.C. § 3732.

16.    Venue is proper in this district and this division pursuant to 28 U.S.C. §§ 1391(b) and (c), as the place where a substantial part of the events or omissions giving rise to the claims occurred.

## STATUTORY PROGRAM AND REQUIREMENTS

17.    In  § 8(a) of the Small Business Act, 15 U.S.C.  § 637, Congress delegated to the SBA authority to enter into contracts with any procurement agency of the Federal Government to furnish required goods or services and, in

turn, to enter into subcontracts with "disadvantaged small business concerns" for the performance of such contracts. *See* 15 U.S.C. § 637(a)(1)(B).

18.    In accordance with its statutory mandate, the SBA established and operates a program (the "8(a) Program") whose purpose is "to assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1.    The 8(a) Program benefits participating companies because, for example, participants may receive sole-source, no bid contracts from or through the SBA. *See* 13 C.R.F. §§ 124.404, 124.501. Contracts awarded under the 8(a) Program may be structured either as subcontracts with the SBA, or direct contracts with the participating procurement agency. *See* 13 C.F.R. § 124.508.

19.    Participation in the 8(a) Program is limited to disadvantaged businesses. A business qualifies as disadvantaged where (i) its management and daily business operations are controlled by one or more "socially and economically disadvantaged individuals," and (ii) if privately held, it is at least 51% unconditionally owned by one or more "socially and economically disadvantaged individuals." *See* 15 U.S.C. §§ 637(a)(4)(i)(I), 637(a)(4)(B)(i).    The Small Business Act provides general definitions of the terms "socially disadvantaged

individual" and "economically disadvantaged individual," 15 U.S.C. §§ 637(a)(5), (6), and leaves further definitions to the SBA.

20.     In addition to limiting participation in the 8(a) Program to disadvantaged business, SBA's regulations also limit participation to "small business concerns," as defined in 13 C.F.R. Part 121. *See* 13 C.F.R. § 124.02(a).

21.     When evaluating the size of a business, the SBA includes the size of its affiliates.  Title 13 C.F.R. § 121.103(a) provides the general rules concerning affiliation, stating as follows:

> 1) Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists.
>
> (2) SBA considers factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exists.
>
> (3) Control may be affirmative or negative. Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.
>
> (4) Affiliation may be found where an individual, concern, or entity exercises control indirectly through a third party.
>
> (5) In determining whether affiliation exists, SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation.

(6) In determining the concern's size, SBA counts the receipts, employees, or other measure of size of the concern whose size is at issue and all of its domestic and foreign affiliates, regardless of whether the affiliates are organized for profit.

22.    A contractor and its subcontractor are deemed to be affiliates in certain circumstances, under the SBA's "ostensible subcontractor rule." That rule can render an otherwise small business ineligible for participation in the 8(a) Program, due to its subcontract with a large business.

23.    Title 13 C.F.R. § 121.103(h) states the SBA's ostensible subcontractor rule, as follows:

(4) A contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

24.    A participant in the 8(a) Program must maintain its eligibility during its tenure in the Program, and must inform the SBA of any changes that would adversely affect its eligibility. *See* 13 C.F.R. § 124.2. To remain eligible for the 8(a) Program after admission, a small business must continue to meet all of the

eligibility criteria. *See* 13 C.F.R. § 124.112(a). Further, it must inform the SBA of any circumstances that would adversely affect program eligibility, "especially economic disadvantage and ownership and control." *Id.*

25.    A small business that fails to meet 8(a) Program eligibility requirements after admission will be subject to termination from the Program, or early graduation, as appropriate. *Id.* If, after a participant has been admitted to the 8(a) Program, the SBA discovers that it has knowingly submitted false information, termination proceedings will be initiated.   In either event, the participant is no longer eligible for assistance under the 8(a) Program. *See* 13 C.F.R. § 124.304(f).

26.    Participants in the 8(a) Program receive an annual review by the SBA. As part of that review, each participant must submit a certification that it meets the eligibility requirements for the program. *See* 13 C.F.R. § 124.112(b)(1).   In addition, the participant also must provide, *inter alia*, (i) a certification that there have been no changed circumstances that could adversely affect its eligibility for the 8(a) Program (or an explanation of any such changed circumstances), (ii) personal financial information for each disadvantaged owner, (iii) records for certain asset transfers, and (iv) a record of all payments, compensation, and disbursements made to each of its owners, officers and directors, or to any person

or entity affiliated with such individuals. *See* 13 C.F.R. § 124.112(b)(2)-(5). Simply put, the SBA strictly polices 8(a) Program eligibility.

27.     Contracts with the United States are heavily regulated. For example, the Office of Federal Procurement Policy has responsibility to provide overall direction of Government-wide procurement policies, regulations, procedures, and forms. *See* 41 U.S.C. §§ 404, 405. Subject to § 405, the General Services Administration, the Department of Defense, and the National Aeronautics and Space Administration must jointly issue a single Government-wide procurement regulation known as the Federal Acquisition Regulation ("FAR"). *See* 41 U.S.C. § 421(c). The FAR is found at Title 48 of the Code of Federal Regulations, Chapter 1, 48 C.F.R. §§ 1.000 to 53.303, and sets forth acquisition regulations applicable to all federal agencies.

28.     Among other things, FAR 19 deals with the 8(a) Program, "under which agencies contract with the SBA for goods or services to be furnished under a subcontract by a small disadvantaged business concern. . . ." 48 C.F.R. § 19.000(a)(6). Specifically, subpart 19.8 of FAR 19 deals with contracts under the 8(a) Program. *See* 48 C.F.R. §§ 19.800-1919.812. Under FAR 19.811-3(d), each contract issued under the 8(a) Program must contain a clause stating that, by submission of its offer, the offeror represents, *inter alia*, that it is in conformance

with its business target activities. *See* 48 C.F.R. § 19.811-3(d), requiring each contract to contain the statements set forth in 48 C.F.R. § 52.219-18. *See also* 13 C.F.R. § 124.509(b)(4).

29.    The purpose of the ostensible contractor rule and other SBA regulations is to prevent other than small firms from forming relationships with small firms to evade SBA's size requirements.

## BACKGROUND

30.    ILF qualified as a socially and economically disadvantaged small business concern under § 8(a) of the Small Business Act, 15 U.S.C. § 637(a).

31.    ILF has successfully performed many federal government construction contracts, sometimes with a large team member and often without any assistance from a large business.

32.    ILF entered into oral and written teaming agreements with the Atkins Companies to pursue set-aside contracts issued by the federal government. Use of a teaming agreement is a common approach for a small business to acquire work using, within limits, the experience and resources of a large business.

33.    ILF relied in part on the resources and bonding of the Atkins Companies to pursue, and, if awarded, to perform the Contracts, which were set-aside for 8(a) contractors. Under a set-aside contract, competition is limited to

similarly situated contractors, in this instance other 8(a) construction firms. Under the teaming agreements, ILF would be the prime contractor and the Atkins Companies would be subcontractor.

34.     The Atkins Companies are large businesses and were ineligible for the Contracts, because the United States set them aside for 8(a) contractors.

35.     ILF, as the 8(a) contractor, was required to control the work of the Contract and to perform a certain amount of work with its own forces. The self-perform labor requirement for an 8(a) construction contract is fifteen percent of the cost of contract performance for personnel. *See* 13 C.F.R. § 125.6.

36.     If the Atkins Companies performed primary and vital requirements or if the ILF were unusually reliant on the Atkins Companies, then the Atkins Companies could be deemed to be an "ostensible subcontractor" of ILF, and the Atkins Companies and ILF would be considered to be affiliated.

37.     If the Atkins Companies or any one of them were deemed to be affiliated with ILF, the combined revenues of the affiliated companies would be used to determine their size, such combined revenues would exceed the size standard of a set-aside contract, and ILF would be ineligible for set-aside contracts.

38.    ILF was awarded ten set-aside contracts with an adjusted total value of $113,794,557, for which one of the Atkins Companies was a subcontractor.  The ten contracts were the following:

| DESCRIPTION | CONTRACT NUMBER |
|---|---|
| Ft. Jackson Chaplaincy Center | Contract No. W912HN-08-C-0021 |
| Ft. Campbell 52d EOD | Contract No. W912HN-08-D-0042-CY04 |
| Ft. Polk Brigade HQ | Contract No. W912HN-08-D-0042, Task Order 0001 |
| Ft. Stewart 3rd Sustainment Brigade HQ | Contract No. W912HN-08-D-0042, Task Order 0002 |
| Moody Air Force Base BRAC Dormitory | Contract No. W912HN-08-C-0033 |
| Moody Air Force Base BRAC Engine Shop | Contract No. W912HN-08-C-0038 |
| Ft. Stewart Sniper Firing Range | Contract No. W912HN-08-D-0046, Task Order 0002 |
| Ft. Jackson Modified Firing Range | Contract No. W912HN-08-D-0046, Task Order 003 |
| Ft. Benning Reception Station Dining Facility | Contract No. W912HN-08-D-0065 |
| Ft. Bragg Chapel | Contract No. W9128F-10-C-0012 |

39.    The Atkins Companies improperly attempted to assert control over each of the Contracts by demanding subcontract terms that placed control of the contract with Post Buckley, by demanding a greater scope of work than permissible under the 8(a) regulations, and by demanding control of the flow of funds.  The Atkins Companies appeared unwilling or unable to acknowledge the limitations on its work scope, performance of work, and management imposed by the regulations.

40.    ILF refused to allow the Atkins Companies a greater role than permitted by the SBA regulations.   In addition, ILF insisted that the Small Business Administration approve the subcontracts and the final scope of work for ILF and Post Buckley.  In order to progress the work, ILF issued a letter of intent and authorization to proceed to the Atkins Companies for each subcontract, subject to approval of the terms and scope of work by the SBA.

41.    The Atkins Companies insisted that it have project management control for each of the Contracts, on the grounds that it was furnishing the surety bonds (payment and performance).   Therefore, although the particular scope of work was different for each subcontract, because each contract was for a different project, the Atkins Companies supplied the project manager and provided the project management.  ILF obtained SBA approval in order to avoid any finding

that the Atkins Companies would be deemed to be an ostensible subcontractor on that basis.

42.    Under each subcontract the Atkins Companies also expressly assumed all responsibilities, risks and obligations toward ILF that ILF assumed toward the Corps of Engineers.

43.    On December 18, 2008, ILF and the Atkins Companies entered an escrow agreement ("First Escrow Agreement") that was the first of two such agreements.   The First Escrow Agreement provided for contract funds to be deposited into ILF's operating account and then transferred from the ILF operating account to the escrow account.   Contract funds were then distributed by an agreed allocation.

44.    The ILF operating account was at Carver State Bank and the payments from the COE went into that operating account.   Before the Atkins Companies submitted the payment applications for the Ft. Bragg Chapel Design Build contract, the Atkins Companies requested that ILF advance funds to subcontractors and suppliers for other teamed projects.   ILF advanced the funds from its line of credit at Carver State Bank.

45.    When the initial payment of $869,270 was received from the Corps of Engineers for the Ft. Bragg Chapel Design Build contract, at the ILF operating

account, the advances made from the line of credit were immediately repaid to Carver State Bank. ILF also funded an additional $395,771 from other sources and transferred that amount to the escrow account.

46. The Contracts were all set-aside 8(a) or HUBZone contracts and, therefore, ILF was required to have the final word in the event of any disagreement about the distribution of funds. The Atkins Companies insisted, however, that the distributions be made in accordance with its directions, in violation of applicable regulations. Eventually, the escrow agent resigned due to the conflicts about distribution of funds.

47. The Atkins Companies then attempted to force ILF to enter into a novation agreement concerning the Chapel Contract, under which an Atkins Company would replace ILF as the prime contractor. This would have violated SBA regulations, and ILF refused.

48. The Atkins Companies next insisted that ILF enter into a new escrow agreement ("Second Escrow Agreement"), naming U.S. Bank as the escrow agent. The initial draft of the Second Escrow Agreement stated that all proceeds from the Contracts would be placed into escrow and that ILF and the Atkins Companies had to agree unanimously on any distributions of escrow funds. For example, it stated that any disbursement would require a "Joint Written Direction" from the parties

and that, prior to such written direction, the parties had to "agree on the amount of payment each party is to receive as distribution from the Escrow Account. . . ."

49.    On January 5, 2011, ILF submitted a draft Second Escrow Agreement to the SBA for its approval.

50.    On January 7, 2011, the SBA stated that the draft Second Escrow Agreement was unacceptable because it gave the Atkins Companies negative control over the escrow funds.  Specifically, the SBA stated that the draft Second Escrow Agreement required "unanimous agreement between the parties [for any payment of funds], which is not allowed."  The SBA further stated that, the Second Escrow Agreement would be acceptable, "as long as [ILF has] final authority on payment of the [escrow] funds. . . ."

51.    The Atkins Companies had knowledge of and agreed to comply with the SBA's requirement that ILF have final authority on payment of the escrow funds.

52.    ILF submitted a revised draft of the Second Escrow Agreement to the SBA.  The On February 8, 2011, the SBA also rejected that draft, stating that sections of the revised draft "still require agreement by all parties for the amount to be billed to the Escrow Agent and the amount to be paid.  Mr. Fleming's signing of

the written direction doesn't equal control of the funds. The parties still must agree – which is control."

53.     Authorized representatives of the Atkins Companies communicated directly with the SBA through a series of emails and in a conference call on February 11, 2011.  They were, therefore, fully knowledgeable about the SBA's requirement that ILF have control of the funds, free of negative control by the Atkins Companies.

54.     As a result of various emails and the telephone conference of February 11, 2011, and in compliance with the SBA's requirement, on February 17, 2011, the parties entered into a modified Second Escrow Agreement. The executed Second Escrow Agreement made clear that ILF had final authority on payment of escrow funds.   In that document, the requirement for a "Joint Written Direction" was eliminated and the language concerning the payment of escrow funds was qualified with the statement "but I.L. Fleming, Inc. will have the ultimate and final decision on payment."

55.     The Atkins Companies improperly refused, however, to proceed with its subcontract scope on the set-aside contracts until it could control the contract funds.  Shortly after the execution of the Second Escrow Agreement, the Atkins Companies began exercising negative control over the escrow funds, insisting that

their agreement was necessary before any escrow funds were paid.  In the attempt to justify these illegal steps, on July 14, 2011, a representative of the Atkins Company contended inaccurately that the Second Escrow Agreement "requires a 3-way unanimous consent (including IFL's) for payments. . . ."

56.    In response to the July 14, 2011 statement by the Atkins Company, the SBA wrote the same day that the "SBA did not agree to any arrangement which requires consent of all parties to disburse funds.  SBA required that ILF control disbursements from the escrow account which contains 8a contract funds when ILF is the prime."

57.    Despite the SBA's repeated and consistent statements that ILF had to have control over escrow fund payments, the Atkins Companies continued to knowingly violate the Small Business Act and SBA regulations by exercising negative control over the escrow funds.  The Atkins Companies also insisted on distributions of contract funds that favored the Atkins Companies and "shorted" ILF, so that ILF could not pay its labor and general conditions.  The Atkins Companies also deliberately delayed the distribution of funds thereby creating problems with subcontractors and suppliers and causing the Corps of Engineers to issue to ILF show cause letters and notices of intent to default.

58.    The Atkins Companies also improperly and illegally delayed performing its work on the Contracts until it believed it could control the funds. The delay by the Atkins Companies prejudiced the work and led to certain of the Contracts being terminated for default.  The Corps of Engineers called upon the surety furnished by the Atkins Companies to assume control of the work on the terminated projects.  The surety entered a takeover agreement with entitlement to all remaining funds and then hired the Atkins Companies as the completion contractor.  In this way, the Atkins Companies assumed control over all the terminated Contracts.

59.    The Atkins Companies also repeatedly contacted the Corps of Engineers, directly and in violation of the subcontracts, claiming ILF had "diverted" funds and had refused to pay subcontractors and suppliers.

60.    The Atkins Companies took these actions with the intent to gain control over the Contracts and acquire the considerable profit in each of the Contract. Ultimately, the Atkins Companies took these actions so that ILF would be terminated for default and the Atkins Companies would assume control, through its surety, of these set-aside contracts.

61.    As a result of the actions of the Atkins Companies, the Corps of Engineers terminated for default the following Contracts:    (a) the Ft. Jackson

MRFR contract, (b) the Ft. Stewart Sniper Firing Range Contract, (c) the Ft. Benning DFAC contract, and (d) the Ft. Bragg Chapel contract. In addition, ILF was forced to relinquish the Ft. Campbell 52nd EOD contract.

62.     The Atkins Companies knew that compliance with the Small Business Act and SBA regulations was an express condition of continued performance under the Contracts and knowingly violated these requirements.

**Count I:  False or Fraudulent Claims**
(31 U.S.C. § 3729(a)(1))

63.     Paragraphs 1 through 62 are realleged as though fully set forth herein.

64.     The Atkins Companies knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2009), specifically, the invoices submitted by the Atkins Companies to ILF which were then submitted to the Corps of Engineers under the contracts.

65.     The acts of the Atkins Companies caused the United States to incur damages in an amount to be determined at trial, and the United States is entitled to treble damages under the False Claims Act.  Because the Atkins Companies willfully violated the applicable law and regulations, there is a presumption of loss

to the United States based on the total contract amount. *See* 15 U.S.C. § 632(W)(1).

66.    The United States is also entitled to civil penalties of not less than $5,500 and up to $11,000 for each violation.

**Count II:  False Statements**
(31 U.S.C. § 3729(a)(1)(B), formerly § 3729(a)(2) (2006))

67.    Paragraphs 1 through 66 are realleged as though fully set forth herein.

68.    The Atkins Companies knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), formerly § 3729(a)(2) (2006), including but not limited to the false claims and certifications submitted to the Corps of Engineers for payment or to the Corps of Engineers in connection with claims for payment.  The Atkins Companies also knowingly made, used, or caused to be made or used false records or statements in order to get their false or fraudulent claims paid by the United States Government.

69.    Because of the Atkins Companies' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## Count III:  Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA)
(12 U.S.C. §§ 1833a(a), (c)(3))

70.    Paragraphs 1 through 69 are realleged as though fully set forth herein.

71.    By reason of the foregoing conduct, the Atkins Companies knowingly made false statements to the SBA for the purpose of influencing its actions and/or obtaining Section 8(a) Program status and the attendant ability to enter into the Contract with the Corps of Engineers, which is a thing of value, in violation of 15 U.S.C. § 645(a).

72.    Under 12 U.S.C. § 1833a(c)(3) and 28 C.F.R. § 85.3(a)(6), The Atkins Companies are liable for civil penalties under FIRREA.

## Count IV:  Unjust Enrichment

73.    Paragraphs 1 through 72 are realleged as though fully set forth herein.

74.    By reason of the foregoing conduct and their violation of federal law, the Atkins Companies were unjustly enriched and are liable to account for and pay such amounts, which are to be determined at trial, to the United States.

## Count V:  Payment by Mistake

75.    Paragraphs 1 through 74 are realleged as though fully set forth herein.

76.    By reason of the foregoing conduct of the Atkins Companies, the United States made payments under mistake of fact.

77.     As a result of these payments made by the United States under mistake of fact, the United States has sustained damages in an amount to be proven at trial.

WHEREFORE, I. L. Fleming as Relator/Plaintiff prays for judgment as follows:

(a)     Under Counts I and II (False Claims Act), for the amount of damages to the United States, trebled as required by law, plus civil penalties as are required by law, together with all such further relief as may be just and proper;

(b)     Under Count II (FIRREA), a civil penalty in an amount to be determined as required by law;

(c)     Under Count IV (Unjust Enrichment), for an accounting and the amount by which the Atkins Companies were unjustly enriched, plus interest, costs, and expenses, and all such further relief as may be just and proper;

(d)     Under Count V (Payment by Mistake), for an accounting and the amount paid to the Atkins Companies by the United States, plus interest, costs, and expenses, and all such further relief as may be just and proper;

(e)     That Relator/Plaintiff be awarded the maximum relator's share allowed pursuant to 31 U.S.C. § 3730(d);

(f)     That Relator/Plaintiff be awarded all costs of this action, including

attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d); and,

(g)     For all other relief the Court deems appropriate and just.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Relator demands a trial by jury.

Respectfully submitted, this ___2nd__ day of July, 2012.

SMITH, CURRIE & HANCOCK LLP

_Ronald G. Robey_

Ronald G. Robey
Georgia Bar No. 609850
Attorney for Plaintiff I. L. Fleming
245 Peachtree Center Avenue, N.E.
Suite 2700 Marquis One Tower
Atlanta, Georgia  30303-1227
Telephone:  404-521-3800
Facsimile:   404-688-0671
Email:        rgrobey@smithcurrie.com

**LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Complaint filed with the Clerk of the
Court has been prepared in 14 point Times New Roman font in accordance with
Local Rule 5.1C.

Dated, July 2, 2012.

_____
Ronald G. Robey
Georgia Bar No. 609850
Attorney for Plaintiff I. L. Fleming
245 Peachtree Center Avenue, N.E.
Suite 2700 Marquis One Tower
Atlanta, Georgia  30303-1227
Telephone:  404-521-3800
Facsimile:   404-688-0671
Email:        rgrobey@smithcurrie.com